1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                      SOUTHERN DISTRICT OF CALIFORNIA

10

11   MICHAEL A. LARRY,            )   Civil No. 09-CV-0950-JLS(WVG)
                                  )
12              Plaintiff,        )   REPORT AND RECOMMENDATION ON
                                  )   DEFENDANTS' MOTION FOR SUMMARY
13   v.                           )   JUDGMENT
                                  )
14   JAMES TILTON, *et al.*,      )
                                  )   [DOC. No. 19]
15              Defendants.       )
                                  )
16   _____ )

17

18        Plaintiff Michael A. Larry sues various prison officials

19   under 42 U.S.C. Section 1983 for alleged civil rights violations

20   that arose from a "modified program" imposed on African-American

21   inmates at Calipatria State Prison in 2007 after several African-

22   American inmates attacked correctional officers.  Pending before the

23   Court is Defendants' motion for summary judgement.  (Doc. No. 19.)

24   Having considered all moving papers, evidence  presented, and the

25   relevant law, the undersigned RECOMMENDS that Defendants' motion be

26   GRANTED in its entirety.

27   / / /

28   / / /

1

09CV950

**I.   BACKGROUND**

**A.    Procedural Background**

On September 2, 2008, Plaintiff filed suit pursuant to 42 U.S.C. Section 1983 in Imperial County Superior Court.  Following the Superior Court's granting of a demurrer, Plaintiff filed an Amended Complaint ("Complaint").  On May 4, 2009, Defendants removed the action to this Court.

The Complaint names the following four Defendants:  James Tilton, T. Ochoa, W.J. Price, and R. Johnson.  It claims violations of the (1) First Amendment, based on denial of access to courts; (2) Fourteenth Amendment, based on race-based disparate treatment; and (3) Eighth Amendment, based on denial of outdoor exercise.

On October 19, 2009, the Court issued a scheduling order that ordered that all discovery be completed on or before May 17, 2010. (Doc. No. 14 at ¶ 3.)  On July 19, 2010, Plaintiff filed a motion for an extension of time to conduct discovery.  (Doc. No. 21.)  On July 21, 2010, the undersigned denied Plaintiff's motion without prejudice on the basis that Plaintiff had not shown good cause to extend the discovery cut-off.  (Doc. No. 23.)  The undersigned instructed Plaintiff to "set forth a specific and sufficiently detailed motion explaining all the documents sought and reasons that justify Plaintiff's request for more discovery."  (Id.)  Plaintiff did not re-file a formal motion for additional discovery.

On June 18, 2010, Defendants filed a motion for summary judgment.  (Doc. No. 19.)  Plaintiff filed an opposition, which did not address Defendants' arguments but again requested more time to conduct discovery.  (Doc. No. 27.)  Defendants filed an opposition to Plaintiff's request for more discovery.  (Doc. No. 29.)

09CV950

B.        **Plaintiff's Allegations**

        The factual allegations below appear in Plaintiff's Complaint. However, none of Plaintiff's subsequent filings contain any evidentiary support for these claims and allegations.

        Plaintiff is an African-American inmate incarcerated at Calipatria State Prison. (Doc. No. 1-2 at 73 (Amended Complaint).)[1] On May 30, 2007, a violent incident occurred between African-American inmates and prison staff. (Id. at 74.) Prison staff allegedly provoked the incident and initiated the physical altercation by pepper spraying inmates for no legitimate reason. (Id.) Plaintiff was not involved in the incident. (Id.) Nor is there any indication that Plaintiff witnessed this incident.

        Prison officials responded to the violence by locking down the entire "B" Facility, in which Plaintiff resided and which included inmates of all races. (Id.) During the lockdown, all inmates were confined to their cells and were not permitted outdoor exercise or allowed to participate in other activities. (Id.)

        On or about June 6, 2007, Plaintiff discovered that African-American inmates continued to be locked down while inmates of other races resumed their normal activities. (Id.)

        On June 7, 2007, Plaintiff filed a grievance that sought reasons why all African-American inmates continued to be locked down. (Id.) On June 21, 2007, Plaintiff was informed that the Secretary of Corrections had ordered the lockdown. (Id. at 75.)

---

[1]     All page references to documents contained in the Court's docket are to the Court Clerk's renumbered pages, not the document's native, pre-filing pagination.

09CV950

1    On June 20, 2007, Hispanic, Caucasian, and other inmates were
2  released from the lockdown. (<u>Id.</u>) However, African-American
3  inmates remained on lockdown. (<u>Id.</u>)

4    On July 11, 2007, the lockdown for certain African-American
5  inmates, including Plaintiff, was lifted but not immediately
6  implemented. (<u>Id.</u>)

7    On July 12, 2007, another African-American inmate assaulted
8  a prison staff member. (<u>Id.</u>) Plaintiff did not witness the assault
9  but alleges that prison staff "manufactured" this incident to extend
10 the lockdown of African-American inmates. (<u>Id.</u>)

11   After the July 12, 2007, incident, Plaintiff was not released
12 from lockdown. (<u>Id.</u>) All of the inmates that participated in the
13 above-noted incidents were removed from the prison's general
14 population and placed in ad seg. (<u>Id.</u>)

15   In total, Defendants allegedly locked down all Facility B
16 African-American inmates from May 30, 2007, to an unspecified date
17 in July 2007. (<u>Id.</u> at 76.) Plaintiff alleges this lockdown was
18 race-based, not based on continuing safety concerns, and was
19 punitive and retaliatory as a result. (<u>Id.</u> at 76-77.) The lockdown
20 deprived Plaintiff of religious services, exercise, and law library
21 access. (<u>Id.</u>)

22   Plaintiff states that the policy of segregating inmates based
23 on race may be constitutionally permissible on a short-term
24 emergency basis, but Defendants exceeded the time that may be
25 reasonably considered a short-term emergency. (<u>Id.</u> at 75-76.)

26   On August 21, 2007, Plaintiff had a legal deadline to file a
27 petition for writ of habeas corpus. (<u>Id.</u> at 77.) Plaintiff sought
28 law library access to copy the writ and mail it to the court. (<u>Id.</u>)

09CV950

1   His request for law library access was denied, and his writ was

2   denied as a result.  (Id.)  It is unclear from the Complaint how

3   this event relates to the lockdown, which the Complaint suggests

4   ended in July 2007.

5   **C.**   **Defendants' Statement of Facts**

6           **1.**   **Violence At Calipatria State Prison in Mid-2007**

7           Defendants' motion provides a detailed explanation of the

8   events surrounding the lockdowns and supports each statement of fact

9   with several sworn declarations.  Plaintiff's bare allegations to

10  the contrary notwithstanding, Defendants' factual statements are

11  otherwise uncontested.

12          Calipatria State Prison is a maximum security prison that

13  houses some of the most violent and unpredictable inmates in

14  California, many of whom are serving life sentences. (Doc. No. 19-7

15  at ¶ 3 (Ochoa Declaration); Doc. No. 19-5 at ¶ 3 (Price Declara-

16  tion).)  In 2007, Defendant Ochoa was the Chief Deputy Warden and

17  Acting Warden at Calipatria.  (Doc. No. 19-7 at ¶ 2)  Defendants

18  Johnson and Price were Facility Captains.  (Doc. No. 19-4 at ¶ 2

19  (Johnson Declaration); Doc. No. 19-5 at ¶ 2.)  In 2007, Defendant

20  Tilton was the Secretary of the California Department of Corrections

21  and Rehabilitation.  (Doc. No. 19-6 at ¶ 2 (Tilton Declaration).)

22  At Calipatria, inmate attacks against correctional officers have

23  occurred on a frequent basis before and during the relevant times in

24  the Complaint.  (Doc. No. 19-5 at ¶ 3.)

25          On May 30, 2007, <u>five</u> African-American inmates attacked and

26  "attempted to murder" two correctional officers in the prison's

27  Facility B.  (Doc. No. 19-7 at ¶ 6 & p. 7 (Ex. A to Ochoa Declara-

28  tion).)  Both officers sustained injury, with one sustaining a scalp

09CV950

1    laceration that required nine staples. (Doc. No. 19-7 at ¶ 6.) The

2    attackers were all housed in Facility B. (Id.) At that time,

3    prison officials did not know exactly which inmates were involved in

4    the planning and staging of the attack, whether more officers were

5    targeted, or whether more attacks were planned. (Id. ¶ 8.) As a

6    result, the prison immediately instituted a "modified program" on

7    all inmates of all races who were housed in Facility B. (Id. ¶ 7 &

8    p. 7.) Defendants explain that a modified program is an emergency

9    measure that is instituted during emergency situations in order to

10   maintain prison security and safety. (Doc. No. 19-5 at ¶ 6.) The

11   program restricts inmates' movements and privileges, and allows

12   prison officials to monitor and control inmates to prevent further

13   attacks and safety threats. (Id.; Doc. No. 19-7 at ¶ 5.) Defen-

14   dants further explain that modified programs differ from lockdowns

15   in that lockdowns impose a total restriction on inmate movements and

16   privileges.[2] (Doc. No. 19-5 at ¶ 5.) A modified program, on the

17   other hand, imposes fewer restrictions, and the various restrictions

18   can be reviewed, updated, and customized. (Id.)

19       Immediately after the aforementioned attack, prison officials

20   immediately began to investigate the attempted murder. (Doc. No.

21   19-7 at ¶ 9 & p. 7.) The investigation sought to uncover the cause

22   of the attack, assess the threat of future attacks, and determine

23   whether any further immediate threats to the safety of officers,

24   staff, and inmates existed. (Id.) Officials interviewed several

25   inmates in Facility B and learned that African-American inmates

26

27   [2]     Facility B was never placed on a total lockdown at any point and was
             subject only to modified programs that allowed inmates some
28           privileges. However, for the sake of readability, the undersigned
             will use "lockdown" and "modified program" interchangeably to refer
             to "modified program."

6

harbored a heightened state of dissension and ill will towards officers for perceived disrespect. (Id. ¶ 24; Doc. No. 19-4 at ¶ 9; Doc. No. 19-5 at ¶ 9.)   However, the investigation revealed that inmates of other races did not share those sentiments. (Doc. No. 19-7 at ¶ 24.)   Further, Defendants aver that five "shanks," or homemade metal stabbing weapons, were found during cell searches, though they do not identify the races of the inmates to whom the weapons belonged. (Id.; Doc. No. 19-4 at ¶ 9; Doc. No. 19-5 at ¶ 9.)

On June 6, 2007, just seven days after the initial modified program, it was updated in light of the initial findings of the investigation. (Doc. No. 19-7 at ¶ 10.)   All African-American inmates in Facility B remained on the modified program, but inmates of other races were returned to their original programs. (Id. at 7 (modified program update).)

Despite the imposition of the modified program, violence and threats against officers continued.   On June 9, 2007, an African-American inmate attacked and choked an officer in Facility B. (Id. at ¶ 24; Doc. No. 19-4 at ¶ 13.)   On June 10, 2007, officials learned that African-American inmates planned to continue their negative attitude towards officers because of perceived disrespect. (Doc. No. 19-4 at ¶ 14.)   On June 21, 2007, another inmate reported that an African-American inmate attempted to incite other African-American inmates to attack staff on the recreational yard. (Id. at ¶ 15.)   On July 2, 2007, another inmate anonymously reported that the Crips gang, whose members are African-American, planned to pay other inmates to stab a correctional sergeant and lieutenant. (Id. at ¶ 16.)

09CV950

1   From June 9, 2007, to July 11, 2007, the modified program

2 remained in effect against African-American inmates because the

3 prison's investigation revealed that there was an ongoing threat of

4 violence against officials. (Doc. No. 19-7 at ¶ 11 & pp. 8-11 (four

5 modified program updates).)

6   Starting on July 11, 2007, the modified program was reconsid-

7 ered and the restrictions on African-American inmates were slowly

8 eased.  (<u>Id.</u> ¶ 11 & p. 12.)  For example, on July 11, 2007,

9 recreational yard time was restored for African-American inmates who

10 were critical workers or  assigned to "A1/A," which Defendants do

11 not define.  (<u>Id.</u>)

12   On July 12, 2007, a third act of violence against an officer

13 occurred, when a Facility B African-American inmate assaulted

14 another officer.  (<u>Id.</u> ¶ 12; Doc. No. 19-4 at ¶ 17.))

15   On July 13, 2007, the modified program was reinstated against

16 Facility B African-American inmates as a result of the previous

17 day's attack. (Doc. No. 19-7 at ¶ 13 & p. 13.) Facility B African-

18 American inmates' recreational yard privileges were again suspended.

19 (<u>Id.</u>)

20   On July 25, 2007, and thereafter, the modified program was

21 twice updated to ease restrictions and restore certain privileges.

22 (<u>Id.</u> at ¶ 14 & pp. 14-15 (two program updates).)

23   For example, on August 8, 2007, an "Unlock List" was created

24 to include inmates who were excused from the modified program.  (<u>Id.</u>

25 ¶¶ 14-15 & p. 15.)  Inmates on the Unlock List were those who the

26 Facility Captains deemed did not pose an immediate safety threat.

27 (<u>Id.</u> ¶ 15.)  From August 8, 2007, until August 30, 2007, African-

28 American inmates were individually screened and added to the Unlock

List.  (Id.)  Inmates who were gang-affiliated, had disciplinary
history in prison, or were deemed a threat to security were excluded
from the Unlock List.  (Id. ¶¶ 15-16.)  Plaintiff was not placed on
the Unlock List for unknown reasons.  (Id. ¶ 16.)

On August 22, 2007, another violent incident occurred when a
Caucasian inmate killed another Caucasian in Facility A.  (Id. ¶ 17
& p. 16.)  As a result, all inmates of all races in the entire
prison were immediately placed on a modified program.  (Id.)
Recreational yard time was suspended for every inmate in the entire
prison.  (Id.)

On August 23, 2007, the prison-wide modified program ended
for Facility B inmates, who returned to their prior programs
(modified or otherwise) while Facility A remained on modified
program.  (Id. ¶ 18 & p. 17.)

On August 30, 2007, the modified program for Facility B
African-American inmates ended and all privileges were restored for
all inmates.  (Id. ¶ 19 & p. 18.)

Based on the above timeline, Plaintiff did not receive
recreational yard time for 3 months:  from May 30, 2007, to August
30, 2007.

        **2.   The Decision Process That Led To The Modified Program**

Of the four Defendants, only Ochoa had the responsibility to
order modified programs.  (Id. ¶ 23.)  His authority to do so
derives from his position as Calipatria's Chief Deputy Warden and
Acting Warden.  (Id.)  The decision to continue the modified program
until August 30, 2007, was solely Ochoa's and was based on several
violent incidents and factors that showed there existed a continu-
ing, immediate threat of harm to officers and inmates.  (Id. ¶ 24.)

09CV950

As Captains, Defendants Johnson and Price reviewed informa-
tion and made recommendations regarding the modified program. (Doc.
No. 19-4 at ¶ 8; Doc. No. 19-5 at ¶ 9.)  However, neither Johnson
nor Price had the authority to order, update, modify, or end the
modified program.  (Doc. No. 19-4 at ¶ 6; Doc. No. 19-5 at ¶ 8.)
Neither Captain had the authority to deviate from Acting Warden
Ochoa's decisions and orders.  (Doc. No. 19-4 at ¶ 7; Doc. No. 19-5
at ¶ 10.)

As Secretary of the California Department of Corrections and
Rehabilitation, Defendant Tilton did not directly manage or
supervise the daily operation of Calipatria State Prison. (Doc. No.
19-6 at ¶ 4.)  That responsibility was delegated to Defendant Ochoa,
the prison's Acting Warden. (Id.)  There were two additional levels
of supervisors between Ochoa and Tilton.  (Id.)  Tilton did not
order, direct, manage, or supervise any lockdowns or modified
programs, race-based or otherwise, at Calipatria. (Id. ¶¶ 5-8.)

Race was a factor considered in the decision to continue the
modified program for African-American inmates.  (Doc. No. 19-7 at
¶ 25.) However, as Defendants explain, race relations in prison are
much different than in the civilized society in which most Americans
live. (Id.)  In prison, inmates organize themselves by race and may
apply pressure to members of their own race to commit crimes and
other rules violations. (Id.)  Moreover, inmates of different races
rarely act together to commit violent acts against prison staff.
(Id.)  For example, an African-American inmate who is not himself
affiliated with any gang may be forced by African-American gang
members to assault an officer, or face the threat of assault himself
if he refuses. (Id.)  Thus, Defendants explain, even if an attack

09CV950

1   is planned by Crip gang members, staff cannot be certain that it

2   will be carried out <u>only</u> by active gang members. (<u>Id.</u>)

3                          **II.   <u>LEGAL STANDARD</u>**

4        Federal Rule of Civil Procedure 56(a) mandates the grant of

5   summary judgment "if the movant shows that there is no genuine

6   dispute as to any material fact and the movant is entitled to

7   judgment as a matter of law."  The standard for granting a motion

8   for summary judgment is essentially the same as for the granting of

9   a directed verdict.  Judgment must be entered "if, under the

10  governing law, there can be but one reasonable conclusion as to the

11  verdict." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250-51

12  (1986).  However, "[i]f reasonable minds could differ," judgment

13  should not be entered in favor of the moving party.  <u>Id.</u>; <u>see also</u>

14  <u>Blankenhorn v. City of Orange</u>, 485 F.3d 463, 470 (9th Cir. 2007)

15  ("If a rational trier of fact might resolve the issue in favor of

16  the nonmoving party, summary judgment must be denied.") (alteration

17  omitted).

18       The parties bear the same substantive burden of proof as

19  would apply at a trial on the merits, including plaintiff's burden

20  to establish any element essential to his case. <u>Anderson</u>, 477 U.S.

21  at 252; <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  Lack of

22  a genuine issue of material fact on a single element of a claim for

23  relief is sufficient to warrant summary judgment on that claim.

24  <u>Celotex Corp.</u>, 477 U.S. at 322-23.

25       The moving party bears the initial burden of identifying the

26  elements of the claim in the pleadings, or other evidence, and

27  "'showing' -- that is, pointing out to the district court -- that

28  there is an absence of evidence to support the nonmoving party's

09CV950

case." <u>Id.</u> at 325; <u>see also</u> Fed. R. Civ. P. 56(c).  "A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth."  <u>S.E.C. v. Seaboard Corp.</u>, 677 F.2d 1301, 1305-06 (9th Cir. 1982).

The burden then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine dispute for trial. <u>Celotex Corp.</u>, 477 U.S. at 324.  To successfully rebut a properly supported motion for summary judgment, the nonmoving party "must point to some facts in the record that demonstrate a genuine issue of material fact and, with all reasonable inferences made in the plaintiff[]'s favor, could convince a reasonable jury to find for the plaintiff[]."  <u>Reese v. Jefferson Sch. Dist. No. 14J</u>, 208 F.3d 736, 738 (9th Cir. 2000) (citing Rule 56; <u>Celotex Corp.</u>, 477 U.S. at 323; <u>Anderson</u>, 477 U.S. at 249).

"When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." <u>Scott v. Harris</u>, 550 U.S. 327, 380 (2007).

### III.  <u>Discussion</u>

Before analyzing Plaintiff's claims, the Court first notes that the analysis below may not be necessary since Plaintiff's opposition does not address <u>any</u> of Defendants' legal arguments or presents <u>any</u> evidence despite having received notice pursuant to <u>Rand v. Rowland</u>, 154 F.3d 952 (9th Cir. 1988), and <u>Klingele v. Eikenberry</u>, 849 F.2d 409 (9th Cir. 1988), specifically telling him how to oppose the summary judgment motion.  (Doc. No. 20.)  As a

09CV950

1  result, Defendants' motion is effectively unopposed.  <u>See</u> Fed. R.

2  Civ. P. 56(e)(3).  Nonetheless, the Court undertakes the analysis

3  below and concludes that Defendants are entitled to summary judgment

4  on the merits.

5  **A.    <u>Plaintiff's Second Motion for Additional Discovery is DENIED</u>**

6       Although  Plaintiff  opposes  summary  judgment  almost

7  exclusively on the basis of former Rule 56(f), the Court partially

8  construes his opposition as a second motion for additional discovery

9  under Rule 56(d).  Pursuant to the authority granted the undersigned

10  by 28 U.S.C. Section 636(b)(1)(A) and Local Civil Rule 72.1(b),

11  Plaintiff's renewed motion for additional discovery is DENIED.

12       **1.    <u>Legal Standard</u>**

13       Federal Rule of Civil Procedure 56(d) (formerly Rule 56(f))

14  allows the Court to defer ruling on a summary judgment motion and

15  allow a party additional time to "obtain affidavits or declarations

16  or to take discovery" if the non-moving party, here Plaintiff,

17  "shows by affidavit or declaration that, for specified reasons, [he]

18  cannot present facts essential to justify [his] opposition."  In

19  seeking such relief, "a party opposing summary judgment 'must make

20  clear what information is sought and how it would preclude summary

21  judgment.'"  <u>Margolis v. Ryan</u>, 140 F.3d 850, 853 (9th Cir. 1998)

22  (quoting <u>Garrett v. City and County of San Francisco</u>, 818 F.2d 1515,

23  1518 (9th Cir. 1987)).

24       Where a party has failed to diligently pursue discovery, it

25  is proper to deny a request under Rule 56(d).  <u>Emplrs. Teamsters</u>

26  <u>Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.</u>, 353 F.3d

27  1125, 1130 (9th Cir. 2004); <u>Cal. Union Ins. Co. v. Am. Diversified</u>

28  <u>Sav. Bank</u>, 914 F.2d 1271, 1278 (9th Cir. 1990).  However, if the

09CV950

1  movant shows that he diligently pursued discovery but simply needs

2  additional time to complete discovery, denying his request is an

3  abuse of discretion.  See Noyes v. Kelly Servs., 488 F.3d 1163, 1174

4  (9th Cir. 2007) (holding that a district court improperly denied

5  request for additional discovery where the plaintiff had pursued

6  discovery but was delayed by the opposing side); Garrett, 818 F.2d

7  at 1518-19 (holding that a district court improperly denied motion

8  where the plaintiff diligently pursued discovery but was unable to

9  obtain complete responses prior to due date of response to the

10  opposing party's summary judgment motion).

11       Finally, denial of a discovery request is also proper when

12  "the movant fails to show how the information sought would preclude

13  summary judgment." Cal. Union Ins. Co., 914 F.2d at 1278; see also

14  Panatronic USA v. AT&T Corp., 287 F.3d 840, 846 (9th Cir. 2002).

15       **2.**   **Background**

16       On October 19, 2009, the Court issued a scheduling order that

17  designated May 17, 2010, as the fact discovery cut-off.  (Doc. No.

18  14 at ¶ 6.)  Two months after that deadline passed, Plaintiff sought

19  to extend it for the first time on July 19, 2010.  (Doc. No. 21.)

20  However, because Plaintiff admitted that he had conducted no

21  discovery and provided no explanation for not doing so, (id. at

22  2:21-26), the undersigned denied the motion without prejudice and

23  instructed him to explain the reasons for his request and identify

24  the additional discovery he sought, (see Doc. No. 23).  Rather than

25  file a renewed motion for additional discovery, Plaintiff used his

26  opposition to Defendants' summary judgment motion to again request

27  additional discovery.  (See Doc. No. 27.)

28

14

1    For their part, Defendants oppose Plaintiff's request on

2  grounds that (1) Plaintiff has not conducted "any type of discovery

3  prior to the expiration of the discovery cut-off date", (Doc. No. 29

4  at 2:23-3:6); (2) the request requires modification of the Court's

5  scheduling order, and the requisite "good cause" does not exist,

6  (<u>id.</u> at 3:7-21); and (3) Plaintiff does not explain the delay in

7  seeking discovery of documents and events which occurred in 2007,

8  (<u>id.</u> at ll. 22-27).

9       **3.   <u>Plaintiff Has Not Been Diligent and Has Made No Showing</u>**
            **<u>That Discovery Will Preclude Summary Judgment</u>**

10

11   The Court denies Plaintiff's second motion for additional

12  discovery because the four arguments the Court can decipher from his

13  moving papers fail to make even a minimal showing that he has been

14  diligent or that the discovery he seeks will preclude summary

15  judgment.

16   First, Plaintiff requests discovery "in light of the fact

17  that information upon which facts are stated in support of Defen-

18  dants['] Motion for Summary Judgment is [sic] in exclusive posses-

19  sion of [D]efendants and can not [sic] be opposed by plaintiff in

20  absence of discovery." (Doc. No. 27 at 2:13-15.)

21   Second, in response to the Court's request that Plaintiff

22  identify what discovery he seeks, he states that he seeks informa-

23  tion regarding Defendant Ochoa's declaration statement that the

24  modified program was ordered because of an immediate and ongoing

25  harm to prison staff and inmates. (<u>Id.</u> at ll. 16-20.)

26   Third, Plaintiff cites to a "group grievance" complaint that

27  fellow inmate Curtis Miller filed with prison officials on July 14,

28  2007, and seeks reports and other documents related to events Miller

09CV950

1   allegedly witnessed.  (Id. at 3:2-22; 4:8-17.)  On two occasions,

2   Curtis witnessed an "altercation" between prison guards and African-

3   American inmates.   (Id. at 3:2-10.)   Also, before one of the

4   lockdowns, he apparently witnessed guards handcuff an African-

5   American inmate and lead him out of Plaintiff's sight.  (Id. at

6   3:10-22.)  Shortly thereafter, the prison alarm sounded, and the

7   African-American inmates learned that they would be placed on a

8   modified program the next morning.   Though he did not witness

9   anything beyond the handcuffed prisoner being led away, Curtis

10  concludes that the alarm and subsequent lockdown were somehow

11  related to the handcuffed prisoner and questions the possibility

12  that a handcuffed prisoner could attack an officer.

13       Finally, Plaintiff explains that he needs to obtain any

14  reports on an anonymous report to officials, that African-American

15  inmates were planning to stab a correctional sergeant.  (Id. at

16  3:23-24.)

17       Considering that the above explanation for the need for

18  discovery was Plaintiff's second opportunity to provide some basis

19  to grant his request, the undersigned finds his renewed request

20  wholly inadequate for the two reasons below.

21       First, Plaintiff has not explained how the discovery he seeks

22  will in any way preclude summary judgment or even minimally support

23  his claims and allegations.

24       In any event, even if the discovery Plaintiff seeks is

25  somehow relevant, his request nonetheless fails because he has not

26  diligently pursued discovery.  As Defendants point out, he was well

27  aware that he had the ability to take discovery, failed to do so,

28  and failed to explain why.  Indeed, Plaintiff was quite eager to

09CV950

1    begin the discovery process, as he twice requested that the Court

2    issue a scheduling order with discovery deadlines. (See Doc. Nos.

3    4, 7.)  The first request came on June 18, 2009, a little over one

4    month after the case was removed to this Court and before Defendants

5    answered the complaint. (Doc. No. 4.)  The second request came on

6    August 17, 2009. (Doc. No. 7.)  The Court issued a scheduling order

7    shortly thereafter on October 19, 2009.  (Doc. No. 14 at ¶ 6.)

8    However, despite his eagerness, Plaintiff conducted no discovery in

9    this case and provides no explanation for his failure to do so.  He

10   did not request any documents.  He did not depose inmate Miller.  He

11   did not depose any of the accused Defendants.  He did not serve

12   written discovery.  He did nothing.

13        The Court also notes that all of the information or documents

14   Plaintiff identified existed during the time period that discovery

15   was open.  Indeed, all of it even pre-dated Plaintiff's filing of

16   the lawsuit.  Plaintiff has not stated that he learned about the

17   information or documents for the first time after the discovery cut-

18   off.  Nor does he identify any information or documents that were

19   created after the discovery cut-off.  The fact that the information

20   he seeks was in Defendant's exclusive control changes nothing since

21   Plaintiff could easily have wrested this information from Defen-

22   dants' control had he diligently pursued discovery.

23        The Court cannot conclude that Plaintiff diligently pursued

24   discovery, nor can it conclude that Defendants delayed him in any

25   way despite his diligence. Cf. Jones v. Blanas, 393 F.3d 918, 930

26   (9th Cir. 2004) (finding abuse of discretion where inmate had

27   diligently pursued discovery by, inter alia, serving multiple

28   interrogatories and requests for documents, but was delayed due to

17

09CV950

1   disagreements with the defendants).   Plaintiff's request for

2   additional discovery is DENIED.

3   **B.** **Defendants Are Entitled To Summary Judgment On Plaintiff's**
    **First Amendment Claim**[3/]

4

5        Plaintiff claims that Defendants violated his First Amendment

6   right to access to courts when "Mrs. Raske," the law librarian

7   denied him access to the prison law library, causing him to miss an

8   August 21, 2007, court deadline.   (Doc. No. 1-2 at 77.)   The

9   undersigned recommends that summary judgment be granted in Defen-

10  dants' favor because (1) the modified programs did not preclude

11  Plaintiff's access to the law library; (2) Plaintiff improperly sued

12  Defendants because if he was denied access, it was Mrs. Raske, not

13  Defendants, who denied him access to the law library; and (3)

14  Plaintiff fails to provide evidence that he suffered actual injury.

15       To succeed on the merits on the access to courts claim,

16  Plaintiff must show: (1) he was unreasonably denied access to the

17  courts and (2) he suffered an actual injury as a result.   See Lewis

18  v. Casey, 518 U.S. 343, 346 (1996); Vandelft v. Moses, 31 F.3d 794,

19  797 (9th Cir. 1994).   A prisoner establishes actual injury by

20  showing he was actually denied access to the courts.   Vandelft, 31

21  F.3d at 797 (citing Sands v. Lewis, 886 F.2d 1166, 1171 (9th Cir.

22  1989)).   An "actual injury" is "actual prejudice with respect to

23  contemplated or existing litigation, such as the inability to meet

24  a filing deadline or to present a claim."   Lewis, 518 U.S. at 348.

25

26

----

27  [3/]     On this claim, and every claim hereafter, Defendant Tilton is
          entitled to summary judgment on the additional basis that there is
28        no evidence or allegation that he was in any way personally involved
          in any of the events in this case.   The uncontested evidence
          establishes that he was not personally involved in any way.

09CV950

1   Insofar as such a claim is based on law library access, there is no

2   absolute right to the use of a prison law library.  <u>Id.</u> at 350.

3       Defendants' evidence establishes that Facility B African-

4   American inmates had access to the law library even during the

5   modified program.  From May 30, 2003, to June 26, 2007, African-

6   American inmates with court deadlines were allowed library access.

7   (Doc. No. 19-7 at 7-9 (Ochoa Declaration, Ex. A).)  From June 27,

8   2007, to August 22, 2007, there were no restrictions on law library

9   access for any inmates, including African-American inmates.  (<u>Id.</u> at

10  10-15.)  Beginning on August 23, 2007, and for six days thereafter,

11  law library access was limited only to inmates of any race who had

12  approved court deadlines.  (<u>Id.</u> at 16.)  After August 29, 2007,

13  there were no restrictions on law library access for any inmate.

14  (<u>Id.</u> at 17-18.) The modified programs never outright denied African-

15  Americans access to the law library.  Indeed, Plaintiff alleges that

16  his "legal deadline" was on August 21, 2007, which was within the

17  June 27, 2007, to August 22, 2007, time period during which there

18  were <u>no</u> restrictions on library access.  Thus, insofar as Plaintiff

19  argues that Defendants, through the modified program, denied him

20  access to the courts, the uncontested evidence establishes that

21  Plaintiff cannot prevail on this basis.

22      Moreover, Plaintiff's own Complaint establishes that he sued

23  the wrong defendants on this claim.  Plaintiff fails to even <u>allege</u>

24  that Defendants were in any way involved in Mrs. Raske's alleged

25  denial of Plaintiff's access to the law library.  The only persons

26  Plaintiff mentions in connection with this claim are Mrs. Raske,

27  Sergeant Catlett, and "building staff or the escorting officer,"

28  none of whom have been sued in this case.  (Doc. No. 1-2 at 77:12-

09CV950

17.)  Defendants are therefore entitled to summary judgment on this claim on the additional basis that they were not personally involved and were not correctly sued on this claim.

Finally, Plaintiff fails to present any evidence to support his claim that his petition for writ of habeas corpus was denied as a result of missing a court deadline.  Beyond his bare assertion that this happened, he presents no evidence, for example, of which court was involved, any case number that would help the Court independently verify his claim, or any documentation of the petition denial.  This despite Plaintiff's allegation that he had a "court order" evidencing the deadline.  (Doc. No. 1-2 at 77:11-13.) Further, the Court's independent research has not revealed any order that denied Plaintiff's petition in 2007 or since.  Consequently, because Plaintiff has not presented _any_ evidence that he missed a court deadline, he cannot establish that he suffered an actual injury even if he had correctly sued Defendants.

**C.   Defendants Are Entitled To Summary Judgment On Plaintiff's Fourteenth Amendment Claim**

Defendants are entitled to summary judgment on Plaintiff's Fourteenth Amendment equal protection claim because Defendants have presented evidence that the modified program imposed on African-Americans was narrowly tailored to further a compelling government interest.

Racial discrimination in prisons and jails is unconstitutional under the Fourteenth Amendment, except for "'the necessities of prison security and discipline.'"  Cruz v. Beto, 405 U.S. 319, 321 (1972) (per curiam) (quoting Lee v. Washington, 390 U.S. 333, 334 (1968) (per curiam)).  A strict-scrutiny standard applies to

09CV950

racial classifications in prisons, requiring that the government prove that such classification is narrowly tailored to further a compelling governmental interest. Johnson v. California, 543 U.S. 499, 505-07 (2005). Under this standard, "the government has the burden of proving that racial classifications "are narrowly tailored measures that further compelling governmental interests." Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 227 (1995). In other words, Defendants must "show that reasonable men and women could not differ regarding the necessity of a racial classification in response to prison disturbances and that the racial classification was the least restrictive alternative (i.e., that any race-based policies are narrowly tailored to legitimate prison goals)." Richardson v. Runnels, 594 F.3d 666, 671 (9th Cir. 2010).

No dispute exists that the state has a compelling interest in prison security, nor can there be such a dispute. See Greene v. Solano County Jail, 513 F.3d 982, 988 (9th Cir. 2008) (citing Cutter v. Wilkinson, 544 U.S. 709, 725 n.13 (2005)). Indeed, "deference is due to institutional officials' expertise in this area." Cutter, 544 U.S. at 725 n.13. The only issue that remains is whether the modified programs instituted here were narrowly tailored to further that interest. Accord Warsoldier v. Woodford, 418 F.3d 989, 998 (9th Cir. 2005). The undersigned concludes that they were.

Defendants' evidence establishes that a dire emergency situation existed in Calipatria's Facility B in the Summer of 2007. In brazen manner, five African-American inmates simultaneously attacked two correctional officers in an attempt to kill them. Not only was the attack violent, it demonstrated that multiple inmates had worked in concert to plan and carry out the attack. As was the

09CV950

1   practice, Warden Ochoa immediately locked down Facility B in its

2   entirety, including all inmates of all races.  The initial facility-

3   wide lockdown was aimed at establishing total control over the

4   inmates to prevent future attacks while the prison investigated the

5   incident.   The initial lockdown was not race-based and does not

6   violate the Fourteenth Amendment.

7          Once officials investigated the incident, they learned that

8   the attack was the result of general discontent and ill will towards

9   officers and was coordinated and pre-planned.   Officials also

10  learned that the general discontent was isolated to one race, the

11  African-Americans.   Indeed, no other race was involved in the

12  original attack and none attacked any guards after they returned to

13  their regular programs.  Knowing that this sentiment was isolated to

14  one race, officials allowed other races to return to their normal

15  programs while they kept African-Americans in a controlled environ-

16  ment for everyone's safety while tensions eased and officials

17  further investigated.

18         Restriction of the entire African-American population in

19  Facility B was necessary  The original attack had already estab-

20  lished that African-Americans were working together to plan and

21  execute attacks on staff.  Further, the investigation revealed that

22  the original attack was not isolated to just the five attackers, as

23  the sentiment of heightened ill will towards officer was shared

24  among uninvolved Facility B African-Americans.   Indeed, just nine

25  days after the original attack, another Facility B African-American

26  attacked and choked a correctional officer even while the modified

27  program was in place.  It bears repeating that correctional officers

28

09CV950

were not attacked by inmates of any other race and it appeared that the heightened threat to officers was limited to African-Americans.

Moreover, because of the manner in which prisoners segregate and classify themselves by race, even non-gang-affiliated inmates are pressured to attack staff, lest they themselves face the gang's wrath. Officials reasonably believed that restricting all African-Americans in Facility B was necessary until each inmate could be individually screened. Otherwise, officials exposed correctional officers to more attacks if they released all uninvolved African-Americans. Thus, by this point, officials knew that there had been a coordinated attack against an officer, a heightened state of ill will existed among Facility B African-Americans, a third officer was attacked and choked just nine days after the first incident, and the identity of the next attacker was uncertain.

The evidence further establishes that, after a short period of time, an Unlock List was established to identify those inmates who were individually determined not to pose an immediate threat to staff. The Unlock List demonstrates a careful attempt to ease restrictions on some African-Americans while maintaining institutional security. The Unlock List belies Plaintiff's contention that African-Americans were categorically locked down without thought or justification. To the contrary, officials attempted to strike a delicate balance between easing restrictions during a time when multiple officers had been attacked on multiple occasions by multiple African-Americans.

In his opposition, Plaintiff cites <u>Richardson v. Runnels</u>, 594 F.3d 666 (9th Cir. 2010), which, upon examination, is distinguish-

09CV950

able from Plaintiff's case.  There, officials instituted several race-based lockdowns after several inmate-on-staff and inmate-on-inmate attacks.  In the first attack, all African-American inmates in one facility where locked down after a lone African-American inmate attacked a correctional officer.  <u>Richardson</u>, 594 F.3d at 669.  Upon investigation, officials learned that the attack was a premeditated and planned assault, <u>id.</u>, but there is no indication that any <u>other</u> inmates besides the attacker were involved in the planning and assault.

One month after the first assault, officials received information that members of the Black Guerilla Family ("BGF") gang intended to attack officers.  <u>Id.</u>  As a result, 100 BGF-affiliated inmates were placed in ad seg.  The subsequent investigation revealed that the information had been fabricated by a correctional officer, and all inmates resumed their normal programming.  <u>Id.</u>

Two weeks later, two African-American inmates attacked one correctional officer.  <u>Id.</u>  As a result, all African-American inmates were locked down.  <u>Id.</u>  However, after a nearly <u>two-month</u> investigation, officials learned that this attack was an isolated event and gradually returned the inmates to normal programming.  <u>Id.</u>

Then, on April 8, 2003, one African-American inmate attacked two officers, resulting in a race-wide lockdown in one facility, despite the seemingly immediate determination that this attack was a result of a two-man conspiracy and not a broader conspiracy.  <u>Id.</u>  Officials later determined that members of the Crips gang were responsible for the attack, and other African-American groups were not responsible.  <u>Id.</u>  As a result, the other groups returned to normal programming while the Crips remained on lockdown.  <u>Id.</u>

09CV950

The Ninth Circuit held that officials had failed to show "that reasonable men and women could not differ regarding the necessity of a racial classification in response to prison disturbances and that the racial classification was the least restrictive alternative" because they had "made no evidentiary showing at all concerning the basis for regarding all African-Americans as a security risk when one or a few African-American inmates are responsible for an assault." Id. at 672-73 (emphasis added).

What sets Plaintiff's case apart from Richardson is that the investigation here revealed that the assaults were not isolated events merely orchestrated and carried out by lone inmates or inmates acting in pairs. Rather, the investigation revealed that (1) the broader sentiment among African-Americans in Facility B was that they had been disrespected by correctional officers, (2) many Facility B African-Americans harbored a heightened state of discontent and ill-will towards officers as a result, and (3) a conspiracy of unknown size existed among inmates to attack officers. Unlike in Richardson, where officials quickly discovered that the attacks were isolated incidents or conspiracies between only two inmates, the conspiracy here was larger than the five inmates who attacked the two officers in the first assault, but its breadth was unknown. The Court recognizes that the April 8, 2003, Crips-related attack against the two officers in Richardson seems factually similar. However, the key distinguishing fact is the absence of information in Richardson that the Crips planned to carry out more assaults against officers. Here, the investigation revealed that more attacks were planned, and more attacks were indeed carried out.

09CV950

1          Moreover, the continued imposition of the modified program on
2    African-Americans was not arbitrary, but based on both the investi-
3    gation and the nature of the attacks.   Indeed, all of the incidents
4    that led to African-Americans only being locked down involved other
5    African-American inmates and no other race.   Moreover, the investi-
6    gation revealed that inmates of other races in fact did not share
7    the same heightened discontent and ill will towards correctional
8    officers.

9          Although it could have been true that not <u>every</u> locked-down
10   inmate shared the sentiment of ill will towards officers, officials
11   had no way of knowing <u>which</u> inmates were safe to release without
12   individually screening every inmate, which officials did.   Faced
13   with (1) the knowledge that the ill will was not isolated only to
14   the attackers, (2) the larger threat of continued attacks against
15   Facility B officers, and (3) the uncertainty of which inmate would
16   carry out the next attack, the race-based modified program in
17   Facility B was narrowly tailored to address the immediate threat
18   officials faced.   Thus, unlike in <u>Richardson</u>, Defendants here <u>have</u>
19   made an evidentiary showing that all Facility B African-Americans
20   posed an immediate security risk until they could be individually
21   screened.   The threat to the correctional officers was much larger
22   than just "one or a few African-American inmates" who were responsi-
23   ble for the assaults in <u>Richardson</u>.   Unlike in <u>Richardson</u>, here,
24   there is no lack of evidentiary basis that a link existed between
25   the attackers and the Facility B African-American population at
26   large.   It is unimaginable how officials could have more narrowly
27   tailored their response in the face of the threats and uncertainties
28   they faced in 2007.   Reasonable men and women in Defendants' shoes

1   at that time would not have disagreed that the modified program was

2   a necessary and narrowly-tailored response.

3   **D.    Defendants Are Entitled To Summary Judgment On Plaintiff's**
        **Eighth Amendment Claim**

4

5       Plaintiff claims a violation of the Eighth Amendment on the

6   basis that he was denied outdoor exercise while he was on the

7   modified program.  Because the modified program was a response to a

8   genuine emergency, Defendants are entitled to summary judgment on

9   this claim as well.

10      Although prison administrators generally have broad discre-

11  tion in determining whether to declare emergencies and impose

12  lockdowns to control institutional disturbances, the conditions

13  imposed during the lockdown may constitute cruel and unusual

14  punishment under the Eighth Amendment.  See Allen v. Sakai, 48 F.3d

15  1082, 1087 (9th Cir. 1994) (denial of outdoor exercise may give rise

16  to Eighth Amendment claim for deprivation of humane conditions of

17  confinement); Hayward v. Procunier, 629 F.2d 599, 603 (9th Cir.

18  1980) (same).

19      Although exercise is "one of the basic human necessities

20  protected by the Eighth Amendment," Pierce v. County of Orange, 526

21  F.3d 1190, 1211 (9th Cir. 2008), "a temporary denial of outdoor

22  exercise with no medical effects is not a substantial deprivation,"

23  Norwood v. Vance, 591 F.3d 1062, 1070 (9th Cir. 2010).  "When a

24  'lockdown was in response to a genuine emergency,' and 'restrictions

25  were eased as the prison administration determined that the

26  emergency permitted,' [courts] may not lightly second-guess

27  officials' expert judgments about when exercise and other programs

28  could safely be restored.  'These decisions are delicate ones, and

09CV950

1   those charged with them must be given reasonable leeway.'" <u>Norwood</u>,

2   591 F.3d at 1069-70 (quoting <u>Hayward v. Procunier</u>, 629 F.2d 599, 603

3   (9th Cir. 1980)).

4        Several distinguished judges in this District have found an

5   absence of Eighth Amendment liability for exercise time denials,

6   that spanned many months, when security concerns justified the

7   deprivation.  <u>See, e.g.</u>, <u>Jones v. Garcia</u>, 430 F. Supp. 2d 1095,

8   1102-03 (S.D. Cal. 2006) (Jones, J.) (finding no Eighth Amendment

9   violation where prisoner was denied outdoor exercise for ten months

10  because of ongoing violence); <u>Hayes v. Garcia</u>, 461 F. Supp. 2d 1198,

11  1201, 1207-08 (S.D. Cal. 2006) (Gonzalez, C.J.) (same for nine-month

12  denial of outdoor exercise); <u>Hurd v. Garcia</u>, 454 F. Supp. 2d 1032,

13  1042-45 (S.D. Cal. 2006) (Benitez, J.) (same for five-month denial).

14       As explored in detail above, Defendants' undisputed evidence

15  establishes that a genuine, ongoing emergency existed at Calipatria

16  during the relevant times of this lawsuit.

17       Moreover, the undisputed evidence amply shows that the

18  modified program was not punitively applied.  Rather, it was a

19  <u>reactive</u> measure used only in response to violent incidents.

20  Defendants did not wantonly place inmates on modified programs for

21  no apparent reason.  Violence against correctional officers

22  triggered the modified programs and continued violence and threats

23  against officers triggered continuation of the program.

24       Finally, there is no evidence that Plaintiff suffered any

25  harm.  Although he alleges that he suffered various injuries,

26  Plaintiff has not provided <u>any</u> evidence to support his allegations.

27       Based on the foregoing, there exists no evidence that the

28  modified programs at issue here violated the Eighth Amendment, and

09CV950

1  ample evidence to the contrary exists.  As a result, Defendants are

2  entitled to summary judgment on this claim.

3  **E.      Defendants Are Entitled To Qualified Immunity**

4         Defendants argue they are entitled to qualified immunity.

5  Plaintiff presents no argument to the contrary.  Because Defendants

6  are entitled to summary judgment on Plaintiff's constitutional

7  claims, the undersigned concludes that Defendants are also entitled

8  to qualified immunity.

9         Government officials are entitled to qualified immunity

10  "insofar as their conduct does not violate clearly established

11  statutory or constitutional rights of which a reasonable person

12  would have known." Liston v. County of Riverside, 120 F.3d 965, 975

13  (9th Cir. 1997) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818

14  (1982)).  The Court engages in a two-part inquiry:  (1) whether the

15  facts shown "make out a violation of a constitutional right," and

16  (2) "whether the right at issue was 'clearly established' at the

17  time of defendant's alleged misconduct." Pearson v. Callahan, 555

18  U.S. 223, 129 S. Ct. 808, 815-16 (2009).  The Court may consider

19  these steps in any order it wishes.  Id. at 818.

20         "[T]here is no necessity for further inquiries concerning

21  qualified immunity" if the Court determines that no constitutional

22  violation has been made out.  Saucier v. Katz, 533 U.S. 194, 201

23  (2001), *overruled on other grounds by* Pearson, 129 S. Ct. at 818.

24         The Court begins by determining whether the facts establish

25  a constitutional violation.  As explained in detail above, Defen-

26  dants are entitled to summary judgment on Plaintiff's three

27  constitutional claims.  As a result, the facts cannot establish a

28  constitutional violation, and the Court's inquiry ends there.  See

09CV950

1    <u>Saucier</u>, 533 U.S. at 201.   Defendants are entitled to qualified

2    immunity.

3                       **IV.   <u>CONCLUSION</u>**

4         Based on the foregoing, the undersigned recommends that

5    Defendants' summary judgment motion be GRANTED in full.

6         This report and recommendation of the undersigned Magistrate

7    Judge is submitted to the United States District Judge assigned to

8    this case, pursuant to the provisions of 28 U.S.C. Section

9    636(b)(1).

10        IT IS ORDERED that no later than <u>March 18, 2011</u>, any party to

11   this action may file written objections with the Court and serve a

12   copy on all parties.  28 U.S.C. § 636(b)(1).  The document should be

13   captioned "Objections to Report and Recommendation."  The parties

14   are advised that failure to file objections within the specified

15   time may waive the right to raise those objections on appeal of the

16   Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153, 1156 (9th Cir.

17   1991).

18   DATED:  March 3, 2011

19

20                                    _____

21                                    Hon. William V. Gallo
                                      U.S. Magistrate Judge

22

23

24

25

26

27

28

09CV950